**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VIRGINIA L. FOX, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SYMBOTIC INC., RICHARD B. COHEN, and CAROL J. HIBBARD<br><br>Defendants | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Virginia L. Fox ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to her own acts, and upon facts obtained through an investigation conducted by her counsel, which included, inter alia: (a) review and analysis of relevant filings made by Symbotic Inc. ("SYM" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of SYM's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired SYM securities between May 6, 2024, to July 29, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning SYM's expected earnings for the third quarter of fiscal year 2024. Defendants' statements included, among other things, confidence in the Company's projected earnings outlook on the back of stable gross margins due to their efforts to decrease costs related to slow deployment times and further accelerate deployment cycles.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of SYM's potential for margin growth in the third quarter; notably, that the Company was not truly equipped to timely deploy their systems or otherwise appropriately manage expenses through project delays. Such statements absent these material facts caused Plaintiff and other shareholders to purchase SYM's securities at artificially inflated prices.

4.      The truth emerged on July 29, 2024 when SYM published their third quarter fiscal year 2024 results. In pertinent part, Defendants' published earnings failed to meet projections due to below-expectation gross margins. Specifically, the Company's third quarter adjusted EBITDA of $15 million missed their prior guide by $13 million at the midpoint, a reduction of more than 46.4%. As a result, Defendants provided fourth quarter fiscal year 2024 guidance that was well-below market expectations.

5.     Investors and analysts reacted immediately to SYM's revelation. The price of SYM's common stock declined dramatically. From a closing market price of $35.63 per share on July 29, 2024, SYM's stock price fell to $27.25 per share on July 30, 2024, a decline of about 23.52% in the span of just a single day.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of herself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant SYM is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**THE PARTIES**

11.      Plaintiff purchased SYM common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing her transaction(s) in SYM is attached hereto.

12.      Symbotic, Inc. is a Massachusetts corporation with its principal executive offices located at 200 Research Drive, Wilmington, MA 01887. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "SYM."

13.      Defendant Richard B. Cohen ("Cohen") was, at all relevant times, the Chairman and Chief Executive Officer of SYM

14.      Defendant Carol J. Hibbard ("Hibbard") was, at all relevant times, the Chief Financial Officer and Treasurer of SYM.

15.      Defendants Cohen and Hibbard are sometimes referred to herein as the "Individual Defendants." SYM together with the Individual Defendants are referred to herein as the "Defendants."

16.      The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SYM's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then

materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.     SYM is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to SYM under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Company Background

19.     SYM develops, implements, and operates end-to-end supply chain automation technology in the United States and Canada.

20.     SYM automates the processing of pallets and cases in large warehouses and distribution centers builds and operates automated warehouse systems for clients in the United States with intentions to expand to Canada and Europe.

### The Defendants Materially Misled Investors Concerning SYM's Revenue Outlook for Fiscal Year 2024

#### May 6, 2024

21.     On May 6, 2024, after the market closed, Defendants issued a press release announcing their second quarter results for fiscal year 2024 as follows: "Symbotic posted revenue of $424 million, a net loss of $41 million and adjusted EBITDA of $22 million." Defendants further issued guidance for the third quarter, anticipating "revenue of $450 million to $470 million, and adjusted EBITDA of $27 million to $29 million."

22.     During the same-day earnings call, Defendants provided further details regarding their projected growth. Chairman and CEO Richard B. Cohen highlighted "[k]ey innovations this

quarter, include[ing] advancing our core technologies and artificial intelligence and automation, improving system performance and the customer experience, enhancing safety **and accelerating deployment**" (emphasis added).

23.     CFO and Treasurer Carol J. Hibbard spoke further to their second quarter margin trends before outlining the Company's expectations for the third quarter, stating, in pertinent part:

> Overall, non-GAAP gross margin was down slightly from last quarter, but still better than expected. The innovations we deployed during the second quarter weighed upon system gross margin, but were largely offset by effective cost management and solid project execution.
>
> System adjusted gross margin remained stable at 20% and generally in line with last quarter. ***As usual, our system gross margin also reflects burden of pass-through costs and lower-margin innovation projects that weigh on a reported gross margin. Our combined recurring revenue streams contributed to positive adjusted gross profit. This demonstrates the high leverage in our business model, showing that we can be profitable with a small number of active sites generating recurring revenue, while also being invested for the much larger number of systems still in deployment***.
>
> . . .
>
> Operating leverage improved again sequentially as we achieved a 5.3% adjusted EBITDA rate, compared to a 3.8% rate last quarter. This was driven by rapid revenue growth and gross margin expansion, along with stable operating expense.
>
> . . .
>
> For the third quarter of fiscal 2024, we expect revenue of $450 million to $470 million and adjusted EBITDA between $27 million and $29 million. This represents revenue growth of over 47% and an adjusted EBITDA margin increase.

(Emphasis added).

24.     The question-and-answer portion of the call followed wherein the Defendants elaborated further on their margins as follows:

> <Q: Nicole Sheree DeBlase – Dutsche Bank AG – Director and Lead Analyst> I wanted to ask a couple on the financials. So the first is the system's gross margin fell to low double digits. I think you guys talked about in the opening remarks how that was driven by all of this innovation that you're working on. I guess, how quickly can that gross margin step up to a high teens or better level? Is that

something you expect in the second half? Or will these innovation headwinds continue?

<A: Carol J. Hibbard> We did better than expected on gross margin. But as you indicated, we were stable quarter-over-quarter. And so a couple of items that weigh on our gross margin. So I'll talk about the things that are weighing on those gross margins now and then what we see for the future. So a couple of the things are the innovations that we have in work. ***We talked last quarter about focusing on additional resources to ensure quality deployments for some of those sizable projects we have in flow.***

We have the benefit on many of our contracts that we have pass-through costs, so why we're able to pass that through with a profit that remains stable that it weighs on our gross margin.

And then lastly, ***what's weighing on our gross margin is we have several lower margin projects in flow. And I would expect to see those start completing in the second half of this year. And so our 3Q guide reflects stable gross margins***. So as I said, we've got several significant milestones coming up in the second half of the year on some of these big projects. And gross margin won't improve every quarter, but we expect improvement in the coming years and that that will step up year-over-year.

And as I mentioned earlier, just in terms of the unlock for gross margin, ***the single biggest one being the time it takes to deploy our system. And we continue to see steps in the right direction with each one that we're rolling out.***

. . .

<Q: Derek John Soderberg – Cantor Fitzgerald & Co. – Research Analyst> Got it. And then as my follow-up, just to clarify some of your commentary, Carol, I think you said there are some lower-margin projects out there. Can you talk a bit about what's changing on the project front that would characterize a project as low margin at this point? And what kind of step-up in gross margins might we see after, I guess, some of these low-margin projects or work through this year? I'm just looking for you to kind of clarify some of that.

<A: Carol J. Hibbard> Yes. ***So we've got projects in flow that were our earlier innovation projects, some of them fairly early systems, proof of concepts are included in there. And so as they burn off, you'll start to see our gross margin step up***. I'm not going to tie a specific time line to those because the schedules vary. But you should expect into next year gross margin to start stepping up.

(Emphasis added).

<u>*May 9, 2024*</u>

7

25.     On May 9, 2024, SYM conducted their annual Analyst/Investor Day presentation. During the question-and-answer portion of the call CFO Hibbard spoke again on the Company's projected margins going forward as follows:

> <Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head> Andy Kaplowitz from Citigroup. I mean, clearly, you've always been focused on quality and safety and what have you. But it does seem like today, you're talking about sort of a real focus on Six Sigma and really improving the system. And I think, Carol, you talked about you're going to do some low-margin projects on the earnings call, and you did that big restructuring, Rick.
>
> So does that mean a pretty big jump in gross margins as you look forward? I know you're not going to give guidance, all that kind of stuff. But like at the same time, I do sense like an increased focus and maybe you clear out stuff with that restructuring and sort of you move forward into next year on a higher playing field. Is that the right perception of what's going on here?
>
> <A: Carol J. Hibbard> I'd say, yes, I'll start, and then I know you talked quite a bit about quality as did Aftab. And it's a huge focus, not just for cost though. It's a focus for scale. So you can't possibly scale if you have poor quality coming from your supply chain or we, in fact, aren't coming down the learning curve in terms of how we're commissioning. So it's both. There is a big focus on doing that, but I think the start of that focus was on how do you continue to scale and grow because with the backlog that we have, we have to deliver that backlog flawlessly so that we can continue to make room to improve and grow the rest of it.

26.     The above statements in Paragraphs 21 to 25 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected earnings outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, SYM's optimistic reports of growth, improvements to gross margin, and overall stability of its ongoing projects fell short of reality; the Company was not equipped to timely deploy their systems or otherwise appropriately manage its expenses through project delays.

***The Truth Emerges During SYM's Third Quarter Earnings Report***

<u>*July 29, 2024*</u>

27.     On July 29, 2024, Defendants released their Q3FY24 results below margin expectations and provided lower-than-expected Q4FY24 guidance as follows:

> Symbotic posted revenue of $492 million, a net loss of $14 million and adjusted EBITDA of $15 million for the third quarter of fiscal 2024.
>
> . . .
>
> For the fourth quarter of fiscal 2024, Symbotic expects revenue of $455 million to $475 million, and adjusted EBITDA of $28 million to $32 million

28.     SYM hosted an earnings call the same day which again included Defendants Cohen and Hibbard. During the call, CEO Cohen highlighted the miss on gross margin expectations, stating, in pertinent part: "Our third quarter reflects record revenue growth, strong recurring revenue gross margin, and careful management of operating expenses. However, our system gross margin reflects elongated construction schedules and implementation costs associated with last quarter's rapid pace of innovation."

29.     CFO Hibbard spoke in accord, pertinently stating, "system gross margin fell below expectations due to schedule growth and higher labor costs during the quarter. We are focused on improving our planning, speed of implementation, and project management to enhance performance of the business."

30.     During the question-and-answer portion of the call, Defendants elaborated further on the issues that impacted their Q3 gross margins and Q4 projections:

> <Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head>
> Rick or carol, can you give a little more color into what happened with system gross margin and why it will rebound in Q4? Are you basically saying that in some cases, outsourcing is not working for your deployments? And maybe what's happened to convince you to take construction management again in-house, and what is the visibility into your Q4 expected margin improvement?

<A: Carol J. Hibbard> . . . So, on the outsourcing, as we talked about outsourcing, our primary reason why we chose outsourcing over a year ago was to go ahead and scale. And so, we did that across multiple areas of our supply chain so that we could also have redundancy.

We're looking at bringing back in-house just 1 element, which is the EPC, so the Engineering Procurement Construction piece of that. And we continue to own a piece of that. So, actually, Symbotic continued to deploy at some of our sites and then we had multiple supply chain partners off doing that.

What we're finding is why that's not a significant item in terms of the overall cost of the system, it's a significant item in terms of that final mile of installation when you're extremely focused on making sure that everything comes together. ***We're finding that focus on schedule and focus on cost, that's a critical point for us***. So, that's one of the elements that we're going to bring back in-house so that we have more control over that overall integration.

In terms of the other things that really drove our gross margin performance in this quarter, Rick mentioned we've had delays in construction creating inefficiencies. And so, some of our more complex projects, ***we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient.***

And our projects are taking longer. I think last quarter I referred to some of the projects that we had in flow where we're not always going to see that 20-month deployment because I think I called them stragglers. ***And what we're seeing now is some of those complex systems where they're just taking longer. Longer system deployment creates higher costs.***

. . .

<A: Richard B. Cohen> Yes. I think the most important thing is our margin is down, but we're not a retail company, so we're not discounting. We're getting the gross profits that we want, but the projects have been costing more than we anticipated. Keep in mind, we've done about 40 projects so far. We have hundreds ahead of us.

. . .

***So, I think we made some choices. We could have fought with the customers over who pay some of these things***, but we said, let's just keep the customer happy. Let's keep the sales rolling. Some of these things we'll absorb now. And some of these things will not be expenses in the future, and I fully well expect our margin to come back. And our goal is to enhance the margin further. But just getting back to where everybody expected us to be would be a good place in the near term.

<Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head>
No, that's fair, Rick. And should we think about it though, as like in "onetime in Q3" and that's why it comes back in Q4? Because you're talking about normalized margins just in this current quarter, basically.

<A: Richard B. Cohen> Yes. I think I'll let Carol speak, but ***things like delays, because things weren't placed orders on time, and you have 200 people standing around the site, that's just not acceptable***. And we don't expect that to happen in the future. So, it's not like we'll go to 0 immediately, but most of this stuff should go away from what we're seeing and the people that we've hired in the fourth quarter.

(Emphasis added).

31.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the May 6 earnings call and the subsequent May 9 investor/analyst day presentation. On those calls, Defendants projected an outlook reflecting stable gross margins, highlighted their efforts to decrease costs related to slow deployment times, and claimed to put forth efforts to accelerate deployment cycles, while also continually minimizing risks associated with seasonality and the potential impact of the macro environment on the Company's future profitability.

32.    Investors and analysts reacted immediately to SYM's revelation. The price of SYM's common stock declined dramatically. From a closing market price of $35.63 per share on July 29, 2024, SYM's stock price fell to $27.25 per share on July 30, 2024, a decline of about 23.52% in the span of just a single day.

33.    A number of well-known analysts who had been following SYM lowered their price targets in response to the Company's disclosures. For example, William Blair, while retaining its market perform rating, noted the Company third quarter adjusted EBITDA was "well below … consensus of $29.1 million" and the projected fourth quarter guidance "came in below … consensus" on both revenue, of $516.9 million, and EBITDA, of $38.9 million.

34.     Similarly, BWS Financial Inc., while shifting to a sell rating, highlighted that "Sym's management referred to delays in permits and product delivery resulting in people not having anything to do. This is a characterization of a construction/contracting company and not one developing automated technology."

35.     The fact that these analysts, and others, discussed SYM's shortfall and below-expectation projection suggests the public placed significant weight on SYM's prior margin estimates. The frequent, in-depth discussion of SYM's guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

36.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SYM's common stock and operated as a fraud or deceit on Class Period purchasers of SYM's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of SYM's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of SYM's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

37.     SYM's stock price fell in response to the corrective event on July 29, 2024, as alleged *supra*. On July 29, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning SYM's forecasting processes and growth guidance.

38.     In particular, on June 27, 2024, SYM announced third quarter fiscal year 2024 gross earnings significantly below the Company's projections and further presented below-market margin expectations for the fourth quarter.

### *Presumption of Reliance; Fraud-On-The-Market*

39.     At all relevant times, the market for SYM's common stock was an efficient market for the following reasons, among others:

   (a)     SYM's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

   (b)     SYM communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

   (c)     SYM was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

   (d)     Unexpected material news about SYM was reflected in and incorporated into the Company's stock price during the Class Period.

40.     As a result of the foregoing, the market for SYM's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such

information in SYM's stock price. Under these circumstances, all purchasers of SYM's common stock during the Class Period suffered similar injury through their purchase of SYM's securities at artificially inflated prices, and a presumption of reliance applies.

41.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

43.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

44.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of SYM who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SYM's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SYM's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by SYM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of July 29, 2024, there were 585.5 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SYM;

(c)     whether the Individual Defendants caused SYM to issue false and misleading financial statements during the Class Period;

16

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of SYM's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

51.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

17

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SYM common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SYM's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SYM's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

55.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

56.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of SYM's internal affairs.

57.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SYM's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SYM's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SYM's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

58.     During the Class Period, SYM's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SYM's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them

at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SYM's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of SYM's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

59.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about SYM's misstatements.

63.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by SYM which had become materially false or misleading.

64.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SYM disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SYM to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SYM's common stock.

65.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause SYM to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

66.     By reason of the above conduct, the Individual Defendants and/or SYM are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury.

Dated: August 14, 2024                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Shannon L. Hopkins*
Shannon L. Hopkins (BBO# 657485)
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
Tel. (203) 992-4523
Fax: (212) 363-7500
Email: shopkins@zlk.com

                -and-

Adam M. Apton (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*